# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

| | | |
|---|---|---|
| JOSEPH and JOYCE GORDON, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-04-1061 |
| | § | |
| ALLSTATE TEXAS LLOYD'S | § | |
| ALLSTATE INSURANCE CO., *et al.*, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM AND ORDER

This insurance coverage dispute arises from claims for water and mold damage under a homeowners' insurance policy. Joseph and Joyce Gordon ("the Gordons") sued defendants Allstate Texas Lloyds and Allstate Insurance Company ("Allstate") in state court, alleging that the denial of their claims for mold damage was wrongful. Allstate removed on the basis of diversity jurisdiction. After discovery, Allstate moved for summary judgment on the grounds that undisputed evidence showed no mold growth resulting from a covered loss; mold damage is excluded under the policy as a matter of law; and Allstate cannot be held liable for the Gordons' extracontractual claims on the basis of the undisputed facts in the record. The Gordons have filed a response, and Allstate has replied.

To the extent that Allstate moves for summary judgment on the ground that mold damage is excluded under the policy, this court denies the motion without prejudice, pending the Texas Supreme Court's resolution of this question following its certification from the

Fifth Circuit. To the extent that Allstate moves for summary judgment on the ground that certain areas of mold growth in the Gordons' home did not result from a covered event, this court grants the motion in part and denies it in part. This court grants Allstate's motion for summary judgment on the extracontractual claims of breach of the duty of good faith and fair dealing and violations of article 21.21 of the Texas Insurance Code and sections 17.50 and 17.46 of the Deceptive Trade Practices Act and denies Allstate's motion for summary judgment as to the Gordons' claim under article 21.55 of the Texas Insurance Code. The reasons for these rulings are set out below.

**I.    Background**

The Gordons moved into their home in Deer Park, Texas in 1999 and obtained an HO-B homeowners' policy from Allstate. (Docket Entry No. 24, Ex. 1). Joseph Gordon filed a claim under that policy for water damage and mold growth on November 15, 2001. Gordon reported mold growth in the heating, air conditioning, and ventilation system (HVAC); under the kitchen sink; and at the hot water heater in his attic. Allstate investigated the reported loss, asking A Leak Detection & Plumbing Services to examine the home and Granite Mechanical Services to inspect the HVAC. (Docket Entry No. 20, Ex. D, Ex. E). The A Leak Detection report dated December 18, 2001 stated that the "hot water heater galvanized pipe to copper connection is corroded and has had a previous leak," causing water damage to the attic in the area of the hot water heater and the sheetrock ceiling in the garage. The report also stated that the upstairs hall bathroom bathtub escussion covers were not properly sealed and were leaking under normal use, causing water damage to the sheetrock ceiling of

the master bedroom. (*Id*., Ex. D, at 1). A Leak Detection reported no active plumbing leaks near the areas of suspected mold growth. The HVAC report from Granite Mechanical dated December 14, 2001 stated that the HVAC had an improperly sealed return air chase and that one grill showed mold. (Docket Entry No. 20, Ex. E). Allstate denied the Gordons' claim on January 29, 2002 on the basis that no covered loss was claimed. (Docket Entry No. 20, Ex. A).

The Gordons filed suit against Allstate in state court on January 27, 2004. (Docket Entry No. 1, Ex. A). After filing suit, the Gordons added some additional claims for mold damage. The Gordons retained PE Service Environmental to inspect the home. PE Service collected fourteen samples from the Gordon residence, including surface samples, fungal spore traps for air and wall cavities, and a bulk sample of sheetrock. In a report dated February 28, 2001, PE Service stated that it had found mold growth in the master bedroom ceiling under the upstairs bathtub, which was linked to a plumbing leak in the bathtub; in the air conditioning at the closet door, the flex duct serving the master bedroom, and the unit at the blower, which was linked to "condensation and excess humidity inside the closet and dust buildup and excess humidity inside the ducts; and in the garage wall at the washing machine, which was attributed to a plumbing leak at the washing machine. PE Service also found that the airborne spore concentration inside the house was "significantly higher than concentrations normally detected inside residences and was significantly higher than the concentration detected in the air outdoors." (Docket Entry No. 20, Ex. F, at 6). PE Service attributed this to the mold found inside the HVAC and in the garage wall and master

3

bedroom ceiling. PE Service found "no significant concentrations of fungal material" in "any of the five wall cavities tested." (*Id.*). The piece of gypsum board that was removed and tested, the "bulk sample," showed no significant amount of fungal material. (*Id.*). Based on these findings and the elevated concentration of mold within the Gordons' residence, PE Service recommended remediation of the affected areas of the house. (*Id.*).

After discovery, which included depositions of the Gordons, Peter De La Mora and Geoffrey Clark from PE Service, and an Allstate representative, Allstate filed this motion for summary judgment.

## II.   Analysis

### A.   The Applicable Legal Standards

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. *See* FED. R. CIV. P. 56. Under Rule 56(c), the moving party bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Stahl v. Novartis Pharms. Corp.*, 283 F.3d 254, 263 (5th Cir. 2002). If the burden of proof at trial lies with the nonmoving party, the movant may either (1) submit evidentiary documents that negate the existence of some material element of the opponent's claim or defense, or (2) if the crucial issue is one on which the opponent will bear the ultimate burden of proof at trial, demonstrate the evidence in the record insufficiently supports an essential element or claim. *Celotex*, 477 U.S. at 330. The party moving for summary judgment must

demonstrate the absence of a genuine issue of material fact, but need not negate the elements of the nonmovant's case. *Bourdeaux v. Swift Transp. Co., Inc.*, 402 F.3d 536, 540 (5th Cir. 2005). "An issue is material if its resolution could affect the outcome of the action." *Weeks Marine, Inc. v. Fireman's Fund Ins. Co.*, 340 F.3d 233, 235 (5th Cir. 2003) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). If the moving party fails to meet its initial burden, the motion for summary judgment must be denied, regardless of the nonmovant's response. *Baton Rouge Oil & Chem. Workers Union v. ExxonMobil Corp.*, 289 F.3d 373, 375 (5th Cir. 2002).

When the moving party has met its Rule 56(c) burden, the nonmoving party cannot survive a motion for summary judgment by resting on the mere allegations of its pleadings. The nonmovant must identify specific evidence in the record and articulate the manner in which that evidence supports that party's claim. *Johnson v. Deep E. Texas Reg'l Narcotics Trafficking Task Force*, 379 F.3d 293, 305 (5th Cir. 2004). The nonmovant must do more than show that there is some metaphysical doubt as to the material facts. *Armstrong v. Am. Home Shield Corp.*, 333 F.3d 566, 568 (5th Cir. 2003).

In deciding a summary judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party. *Calbillo v. Cavender Oldsmobile, Inc.*, 288 F.3d 721, 725 (5th Cir. 2002); *Anderson*, 477 U.S. at 255. "Rule 56 '*mandates* the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that

party's case, and on which that party will bear the burden of proof at trial.'" *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (quoting *Celotex*, 477 U.S. at 322).

Under Texas law, insurance contracts are subject to the same rules of construction as other contracts. *Performance Autoplex II Ltd. v. Mid-Continent Cas. Co.*, 322 F.3d 847, 853 (5th Cir. 2003); *St. Paul Guardian Ins. Co. v. Centrum GS Ltd.*, 283 F.3d 709, 713 (5th Cir. 2002); *State Farm Life Ins. Co. v. Beaston*, 907 S.W.2d 430, 433 (Tex. 1995). The courts are to give effect to the written expression of the parties' intent. *Utica Nat'l Ins. Co. v. Am. Indem. Co.*, 141 S.W.3d 198, 201 (Tex. 2004); *Beaston,* 907 S.W.2d at 433. All parts of the contract must be read together. *Utica*, 141 S.W.3d at 201; *Balandran v. Safeco Ins. Co. of Am.*, 972 S.W.2d 738, 741 (Tex. 1998). If the policy is not ambiguous, "courts must give the words their plain, ordinary and generally accepted meaning unless the policy shows that the words were meant in a technical or different sense." *Fed. Deposit Ins. Corp. v. Firemen's Ins. Co. of Newark, N.J.*, 109 F.3d 1084, 1087 (5th Cir. 1997). In this case, the parties do not assert ambiguity.

In an action alleging breach of an insurance contract, the plaintiff must show coverage, that the contract was breached, that the insured was damaged by the breach, and the amount of damages resulting from the breach. *Block v. Employers Cas. Co.*, 723 S.W.2d 173, 178 (Tex. App.–San Antonio 1986), *aff'd*, 744 S.W.2d 940 (Tex. 1988). The insured has the burden to plead and prove that the benefits sought are covered by the insurance policy at issue. *Harken Exploration Co. v. Sphere Drake Ins. PLC*, 261 F.3d 466, 471 (5th Cir. 2001); *W. Alliance Ins. Co. v. N. Ins. Co.*, 176 F.3d 825, 831 (5th Cir. 1999). The insurer

bears the burden of showing that one of the policy's limitations or exclusions precludes coverage. *Harken*, 261 F.3d at 471; *Guar. Nat'l Ins. Co. v. Vic Mfg. Co.*, 143 F.3d 192, 193 (5th Cir. 1998). Once an insurer shows that an exclusion arguably applies, the burden then shifts back to the insured to show that the claim does not fall within the exclusion or that it comes within an exception to the exclusion. *Guar. Nat'l Ins.*, 143 F.3d at 193.

### B. The Policy Terms

The Gordons' insurance policy provides in relevant part:

> (1)(f) We do not cover loss caused by:
>
> > (1) wear and tear, deterioration, or loss caused by any quality in the property that causes it to damage or destroy itself;
> >
> > (2) rust, rot, mold, or other fungi;
> >
> > (3) dampness of atmosphere, extremes of temperature.
>
> We do cover ensuing loss covered by . . . water damage . . . if the loss would otherwise be covered under this policy.

(Docket Entry No. 24, Ex. 1, at 7, Policy, Section I - Exclusions, subsection 1(f)). In *Fiess v. State Farm Lloyds*, 392 F.3d 802 (5th Cir. 2004), the Fifth Circuit certified to the Texas Supreme Court the question whether the ensuing loss provision provides coverage for mold contamination caused by water damage that is otherwise covered under the policy. That question remains pending. This case also presents a dispute as to whether the underlying water events are covered by the policy.

### C. The Summary Judgment Record

Allstate based part of its summary judgment argument on the lack of any evidence of water damage or mold growth in certain areas of the house that the Gordons had included in their claims. Allstate argued that although the Gordons reported water damage and mold growth under their kitchen sink, in the attic near a vent pipe, in a half bathroom from an commode that overflowed, and from their roof, there was no evidence of mold growth in any of those areas. Neither the A Leak Detection report, nor the report by PE Service refer to mold in these areas. (Docket Entry No. 20, Exs. D, F). The Gordons noted in their response to Allstate's motion for summary judgment that they "do not seek damages for any areas of the home other than the affected areas identified in the P.E. Service report . . . ." (Docket Entry No. 24 ¶ 12). The PE Service report did not identify the attic, the half bathroom, or the kitchen sink as areas of water damage or mold growth, and did not find a roof leak.

Allstate asserted that although there was evidence of mold growth in certain parts of the HVAC system, including on a grill, in duct work, and in the closet, and in the ceiling of the master bedroom and the left wall of the garage, there was no evidence that it resulted from covered events. (Docket Entry No. 20 at 3–4). Allstate argued that mold growth in the HVAC was caused by poor maintenance (dust build up), condensation, and excess humidity, which are excluded. (Docket Entry No. 20 at 6).

The Granite HVAC report stated that the return air chase of the HVAC was not sealed properly, but that there were no leaks or "breaches" in the system. (Docket Entry No. 20, Ex. E). The PE Service Report concluded that mold in and around the HVAC system was caused by "[c]ondensation and excess humidity inside [the] closet" and "[d]ust buildup and excess

8

humidity inside [the] ducts." (Docket Entry No. 20, Ex. F, at 10). De la Mora, an engineer at PE Service, testified in his deposition as follows:

> Q. And what's the basis of your opinion that condensation and excess humidity inside the closet is the cause of that fungal growth inside the closet?
>
> A. Observation of the type of water stains that we saw that the mold was growing on.
>
> Q. Would this condensation and excess humidity come from the HVAC unit itself?
>
> A. Yes.
>
> Q. How would the AC unit produce condensation and excess humidity inside that closet?
>
> A. Well, apparently there's an opening to the attic that's allowing some of the moist air in.
>
> Q. That allows moist air in from the attic?
>
> A. Right.
>
> Q. There's an opening from the attic into the HVAC closet?
>
> A. There is from the, the vent.
>
> Q. Is that something you would normally encounter?
>
> A. We encounter it a lot.
>
> Q. Is that something that you would consider to be proper construction?
>
> A. It should be sealed. By the time we got there the house was 20 years old, so we don't know whether it was construction that caused it or – access is difficult so.

9

> Q. When you say it should be sealed, do you mean the HVAC closet should be sealed from the attic?
>
> A. Yeah, the space around the vent should be sealed.
>
> Q. Do you know why it would be that this particular HAVC closet had an opening into the attic?
>
> A. They all do. Whether it's sealed or not that's, that's what keeps it from condensing.
>
> . . . .
>
> Q. How would you identify water stains that were caused by excess humidity?
>
> A. Well, water stains always leave a trail that you can follow and see where the origin is, and these water stains pointed to the intrusion of moist air and condensation on the air conditioning and causing excess humidity in the closet.
>
> Q. Are water stains caused by excess humidity distinct in appearance from a water stain caused by a plumbing leak or another water event?
>
> A. They're not a – water stains caused by humidity tend to be just on the surface and they don't seem to get into the material or leave sequential borders.
>
> Q. Whereas, water stains caused by plumbing leaks tend to be deeper than just the surface or –
>
> A. They tend to be deeper than just the surface and also normally you see a series of concentric borders because of the intermittent nature of, of, of the plumbing use.

(Docket Entry No. 20, Ex. K, at 27–30).

Condensation from improper sealing causing excess humidity and dust build up, resulting in mold growth, are not covered perils. Instead, they are problems of maintenance

that are specifically excluded from coverage. *See Fiess*, 392 F.3d at 810 (giving as an example of mold contamination resulting from an uncovered water event mold resulting from "condensation accumulating in an inadequately vented crawl space"); *Garza v. Allstate Tex. Lloyds*, No. 04-270, 2005 WL 2388254, at *4 (S.D. Tex. Sept. 28, 2005) (holding that damage resulting from improperly sealed HVAC system, which allowed hot air from attic to enter system and create condensation, was not covered by similar policy). Allstate's motion for summary judgment based on the claims for mold damage in the HVAC closet and ducts is granted.

PE Service's report showed water damage and mold on the master bedroom ceiling, below the upstairs bathroom, which was attributed to a plumbing leak at the upstairs bathroom bathtub. (Docket Entry No. 20, Ex. F, at 8). Allstate argued that the record shows no evidence of a plumbing leak in the upstairs bathroom bathtub, but rather leaking escussion covers. (Docket Entry No. 20 at 10–11). The report by A Leak Detection noted that a visual inspection of the master bedroom "revealed water damage to the sheetrock ceiling of the master bedroom . . . . caused from the upstairs hall bathroom bathtub escussion covers not being properly sealed and leaking under normal service use." (Docket Entry No. 20, Ex. D). Allstate argued that the homeowner's insurance policy excludes loss caused by improperly sealed escussion covers because that results from wear and tear, an excluded peril. (Docket Entry No. 20 at 11–12). The policy does, however, cover damage from plumbing leaks and overflows. (Docket Entry No. 24, Ex. 1, at 6).

PE Service found that the mold in the master bedroom ceiling was caused by a plumbing leak in the upstairs bathroom. (Docket Entry No. 20, Ex. K, at 21–24). De la Mora testified as follows regarding the mold in the master bedroom:

> Q. What's the basis for listing that cause?
>
> A. Well, location of the water damage in, in relation to the bathtub and the drain in the bathtub.
>
> Q. How do you know there's a plumbing leak or was a plumbing leak at the upstairs bathroom bathtub?
>
> A. Well, it's the only water source in that area that could have caused the, the water damage in that area. That's it.
>
> Q. Did you have a plumbing test performed at the Gordons' residence?
>
> A. No.
>
> Q. Did you ever review any plumbing tests at the Gordons' residence?
>
> A. No.
>
> Q. Did Mr. Walker or anyone else with PE Service observe any active leaks at the upstairs bathroom bathtub?
>
> A. I don't believe the leak was active when we were there. We could see the, the effect of the leak and the water damage.
>
> Q. Do you know where the plumbing leak is or was?
>
> A. It was in the bathtub. To me it looks like a drain leak.
>
> Q. Is there any was to tell from the information you were given [] whether that was a pipe leak as opposed to an escutcheon cover leak?

12

> A. Oh, that was a pipe leak. It's too extensive to be an es–escutcheon cover leak.
>
> Q. And can you explain what you mean by that?
>
> A. Sure. Escutcheon cover leaks are very small. They, they just leak on the – when any water's – either the level of the bathtub reaches that high, which rarely happens, or when somebody's taking a shower a little bit of water spills on to it and it leaks. Not only that, normally the escutcheon cover leak would, would actually come down and fall on the, on the floor of the – on the second floor decking cause of the slope of the back of the bathtub or the front of the bathtub, I'm sorry. So it's, it's not difficult to notice the difference between a escutcheon leak or a pipe leak.
>
> Q. So is it fair to say that you can tell from the water damage in that area whether it was a pipe leak or an – as opposed to an escutcheon cover leak?
>
> A. Yes.
>
> Q. And it's your opinion that the cause of the water intrusion at the upstairs bedroom bathtub was in fact a pipe leak and not an escutcheon cover leak; is that correct?
>
> A. I believe that.

(Docket Entry No. 20, Ex. K, at 22–23). Joyce Gordon testified that there had previously been a leak in the upstairs bathroom shower and that her daughter's boyfriend had fixed it. (Docket Entry No. 24, Ex. 7, at 43). Joyce Gordon also testified that the hot water heater had previously leaked, causing water damage to the ceiling of the master bedroom. (*Id.* at 25–26). The A Leak Detection report stated that the hot water heater had previously leaked. (Docket Entry No. 20, Ex. D). This court finds that there is a disputed issue of material fact

as to whether the water damage and mold on the master bedroom ceiling was caused by a covered peril. Allstate's motion for summary judgment is denied as to this claim.

Allstate also argued that there was no evidence of a plumbing leak in the washing machine causing mold damage in the garage wall. The A Leak Detection report showed no plumbing leaks at the washing machine in the garage. (Docket Entry No. 20, Ex. D). Joyce Gordon testified that they had never experienced a water leak or any water damage involving the washing machine and had not seen any leaks in the area. (Docket Entry No. 24, Ex. 7, at 41–42). The PE Service report, however, found mold on the left wall at the washing machine and evidence of water damage consistent with a plumbing leak at the washing machine located next to the garage wall. (Docket Entry No. 20, Ex. F, at 8). The record discloses a disputed issue as to whether the mold in the garage wall near the washing machine was the result of a covered peril. Summary judgment is denied as to this part of the Gordons' claim.

PE Services found elevated concentrations of airborne spores throughout the house. (Docket Entry No. 20, Ex. F). De la Mora testified that PE Services took a spore trap sample in the downstairs hallway because "the downstairs hallway's where the return air is and that's where you take the, the spore trap sample in a house and close to the return air because all the air in the house is going to be sucked up through that return air eventually and re-circulated." (Docket Entry No. 20, Ex. K, at 42–43). PE Services concluded that the Aspergillus/Penicillium spore count was high. (*Id.* at 43–44; Docket Entry No. 20, Ex. F, at 8). Aspergillus/Penicillium mold is not reported in any of the other three areas where PE

14

Services located mold. (Docket Entry No. 20, Ex. F, at 8). De la Mora testified that it was likely caused by condensation in the HVAC system. The PE Services report lists the cause of the elevated spore concentration in the air as "Suspected HVAC and visible water damage and mold." (Docket Entry No. 20, Ex. F, at 8).

The record does not show that the type of spores found in the air, Aspergillus/ Penicillium, resulted from a covered loss.[1] The mold found on the master bedroom ceiling, which was attributed to a plumbing leak in the upstairs bathroom, was Alternaria, Ascospores, and Bipolaris/Dreschlera. (Docket Entry No. 20, Ex. F, at 8). The mold found on the wall in the garage, which was attributed to a plumbing leak in the washing machine line, was Stachybotrys. (*Id.*). The only indication of the cause of Asbergillus/Penicillium in the record is Peter de la Mora's hypothesis that it resulted from condensation in the HVAC system, an uncovered peril. Plaintiffs have failed to show a covered loss with regard to the mold count in the air in their house. Allstate's motion for summary judgment is granted as to the Gordons' claims for mold in the air of their house.

As noted, this court has denied without prejudice Allstate's motion for summary judgment based on the district court decision in *Fiess,* pending the outcome of the Texas Supreme Court's resolution of the certified question. Although this court has found fact

---

[1] Peter de la Mora testified as to how mold spores travel within a house: "[M]old spores are very light. They're carried by air and when the air-conditioning runs there's a transfer of air from room to room through to the air-conditioning – air handler and back into the ducts." (Docket Entry No. 20, Ex. K, at 47). The record shows that there are different types of mold spores throughout the house and that the mold types in the master bedroom ceiling, the garage wall, near the washing machine, and in the HVAC system differ from the airborne mold spores.

15

issues as to whether mold damage to the master bedroom ceiling and to the garage wall near the washing machine resulted from covered losses, if, as Allstate argues, all mold damage is excluded from coverage, summary judgment would be appropriate on those claims as well.

## V.     The Extracontractual Causes of Action

"Under Texas law, there is a duty on the part of the insurer to deal fairly and in good faith with an insured in the processing of claims." *Higginbotham v. State Farm Mut. Auto. Ins. Co.*, 103 F.3d 456, 459 (5th Cir. 1997) (citing *Arnold v. Nat'l County Mut. Fire Ins. Co.*, 725 S.W.2d 165, 167 (Tex. 1987)). "A cause of action for breach of the duty of good faith and fair dealing exists when the insurer has no reasonable basis for denying or delaying payment of a claim or when the insurer fails to determine or delays in determining whether there is any reasonable basis for denial." *Higginbotham*, 103 F.3d at 459 (citing *Arnold*, 725 S.W.2d at 167). The issue in a bad faith claim is whether the insurer's conduct was reasonable. *See Tucker v. State Farm Fire & Cas. Co.*, 981 F. Supp. 461, 465 (S.D. Tex. 1997); *Lyons v. Millers Cas. Co. of Tex.*, 866 S.W.2d 597, 601 (Tex. 1993). "A *bona fide* controversy is sufficient reason for failure of an insurer to make a prompt payment of a loss claim." *Higginbotham*, 103 F.3d at 459. "As long as the insurer has a reasonable basis to deny or delay payment of a claim, even if that basis is eventually determined by the fact finder to be erroneous, the insurer is not liable for the tort of bad faith." *Id.* at 459 (citing *Lyons*, 866 S.W.2d at 600).

A violation of the duty of good faith and fair dealing is also an unfair insurance practice under article 21 of the Insurance Code, *Performance Autoplex II Ltd. v. Mid-Continent Cas. Co.*, 322 F.3d 847, 860–61 (5th Cir. 2003), and a violation of the DTPA, Tex. Bus. & Com. Code Ann. § 17.50(a); *Thrash v. State Farm Fire & Cas. Co.*, 992 F.2d 1354, 1357–58 (5th Cir. 1993). Extracontractual claims under the Texas Insurance Code and the DTPA "require the same predicate for recovery as bad faith causes of action." *Higginbotham*, 103 F.3d at 460.

The Gordons alleged that Allstate acted in bad faith by wrongfully refusing to pay for their claim. (Docket Entry No. 1, Ex. A ¶ 11). Joyce Gordon testified that Rodney Harrison treated her rudely. (Docket Entry No. 24, Ex. 7, at 51–53). She testified that Allstate informed her, after the Gordons initially complained of mold damage, that their residence had mold damage but that Allstate refused to "do anything about it." (*Id.* at 51). These allegations and the summary judgment record do not raise a fact issue as to whether Allstate violated its extracontractual duties. The Gordons reported mold growth in their residence on November 15, 2001. Allstate retained A Leak Detection to inspect the residence and Granite Mechanical Services to inspect their HVAC system, receiving both reports by December 18, 2001. (Docket Entry No. 20, Exs. D, E). A Leak Detection reported no active plumbing leaks near the areas of reported mold. (*Id.*, Ex. D). Granite reported that the HVAC system had an improperly sealed return air chase. (*Id.*, Ex. E). Based on these reports and based on the exclusion of mold as a covered loss, Allstate concluded that the Gordons had not suffered a covered loss. Given the uncertainty as to the legal obligation imposed under the policy, the

information as to the type of damage and its likely causes, and the facts that were before the insurer, Allstate did not breach its duty of good faith and fair dealing. The record reveals a bona fide dispute as to the insurer's liability on the contract. *See State Farm Fire & Cas. Co. v. Simmons*, 963 S.W.2d 42, 44–45 (Tex. 1998). This court grants Allstate's motion for summary judgment as to the Gordons' extracontractual claims for breach of the duty of good faith and fair dealing and violations of article 21.21 and the DTPA.

Article 21.55 (currently article 542.051 *et seq.*) of the Texas Insurance Code "requires the prompt payment or resolution of claims according to a defined timetable." *DeLeon v. Lloyd's London, Certain Underwriters*, 259 F.3d 344, 354 (5th Cir. 2001); *see also Performance Autoplex II*, 322 F.3d at 860–61.

In light of the fact issues regarding Allstate's liability on some of the Gordons' breach of contract claims, summary judgement is not warranted as to the Gordons' claim under article 21.55 of the Texas Insurance Code.

## VI. Conclusion

Allstate's motion for summary judgment as to the breach of contract claims is granted in part and denied in part. Allstate's motion for summary judgment is granted as to the Gordons' extracontractual claims of a breach of the duty of good faith and fair dealing and violations of article 21.21 of the Texas Insurance Code and sections 17.50 and 17.46 of the Deceptive Trade Practices Act. Allstate's motion for summary judgment as to the Gordons' claim under article 21.55 of the Texas Insurance Code is denied. Because of the relationship

of the remaining claims to the question pending before the Texas Supreme Court, this case is stayed until that question is answered.

        SIGNED on March 2, 2006, at Houston, Texas.

                                                               _____

                                                                    Lee H. Rosenthal
                                                  United States District Judge